1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ANTUON EUGENE GREY,                    Case No.:  16cv2764 GPC (AGS)

12                          Petitioner,
                                           **REPORT AND**
13   v.                                    **RECOMMENDATION:**
                                           **(1) DENYING PETITION FOR**
14   WARREN L. MONTGOMERY                  **WRIT OF HABEAS CORPUS; and**
     Warden,                               **(2) DENYING REQUEST FOR**
15                                         **EVIDENTIARY HEARING**
                         Respondent.
16

17   **I.    INTRODUCTION**

18          Petitioner Antuon Eugene Grey, a state prisoner proceeding with counsel, has filed

19   a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet.")

20   challenging his convictions in San Diego Superior Court case no. SCD240243 for

21   murder, attempted murder and assault with a firearm.  (Pet., ECF No. 1.)[1]  Grey raises

22   four grounds in the Petition.

23          The Court has read and considered the Petition, the Answer and Memorandum of

24   Points and Authorities in Support of the Answer ("Answer") [ECF No. 14], the Traverse

25   [ECF No. 20], the lodgments and other documents filed in this case, and the legal

26

27   ───────────────

28   [1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted
     by the Court's electronic case filing system, except for lodgments.

arguments presented by both parties. For the reasons discussed below, the Court **RECOMMENDS** the Petition and the request for an evidentiary hearing be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recounted the facts as follows:

> On January 20, 2012, Hopeton Bennett, a member of the Parkside/Skyline gang known as "Baby Dos," was shot and killed, and Parkside/Skyline gang member Julian Velasquez was shot. Grey was also a member of the Parkside/Skyline gang and was known as "Little Dos." The naming arrangement between Grey and Bennett indicated that Grey was something of a mentor to Bennett.
>
> The following day, [Dave] Lockett was visiting some family members at an apartment complex on Solola Avenue in San Diego. While in the parking lot, Lockett ran into an acquaintance, [Edwin] Jackson, who lived at the complex. Jackson was a member of the Lincoln Park gang, the chief rival of Parkside/Skyline gang. The Lincoln Park gang was known to occupy the apartment complex on Solola Avenue.
>
> As Lockett started back to his relative's apartment, he saw two black males, one of whom he later identified as Grey, approaching from the parking lot entrance. Another witness heard Jackson ask the men, "Blood, who is you niggers?" After a brief exchange, Grey pulled a firearm from his sweatshirt pocket and fired the weapon, striking Lockett in the stomach as Lockett dove to the ground. Lockett then heard running footsteps and multiple gunshots. A number of these shots struck Jackson, who died from his injuries. Police recovered a beanie hat from the scene with DNA analysis producing a match to Grey's brother.
>
> Later that day, Lockett gave a description of the shooter to police, noting that the shooter had a lot of acne on his face. Lockett, however, did not get a good look at the face of Grey's companion. As a result of the DNA match, police went to the residence of Grey's brother where they

encountered and photographed Grey, who had distinctive acne on his face and appeared to fit the general description of the shooter. Police recovered from the residence a pamphlet for Bennett's funeral memorial.

Police later conducted an audio-recorded lineup with Lockett. Lockett selected Grey's photograph out of a five-photograph lineup and identified him as the shooter. The detective, however, forgot to have Lockett sign the photograph. The following day, police conducted another audio-recorded photographic lineup with Lockett. Lockett again identified Grey's photograph as the shooter and signed the photograph. Lockett testified at trial he had not doubt and was "100 percent" sure Grey was the shooter.

A gang expert testified regarding gangs and gang culture, including that acts of violence between rival gangs result in violent retaliation. Based on a hypothetical mirroring the prosecution's evidence, including the shooting death of Bennett approximately 30 hours earlier, the gang expert opined that the shooting in this case was committed for the benefit of the Parkside/Skyline gang.

(Pet., ECF No. 1-3 at 2-4.)

## III.   **PROCEDURAL BACKGROUND**

On January 7, 2013, the San Diego District Attorney's Office filed a complaint charging Antuon Eugene Grey with one count of murder (count one), a violation of California Penal Code (Penal Code) § 187(a), one count of attempted murder (count two), a violation of Penal Code §§ 187(a) and 664, and one count of assault with a semiautomatic firearm (count three), a violation of Penal Code § 245(b). (Lodgment No. 8, Vol. 1 at 0001-06.) As to counts one and two, the complaint alleged Grey had intentionally and personally discharged and used a firearm, within the meaning of Penal Code §§ 12022.53(d) and e(1). (*Id.* at 0002-03.) As to counts two and three, the complaint also alleged Grey had personally used a firearm, within the meaning of Penal Code § 12022.5(a), had committed the crimes alleged in those counts for the benefit of, at the direction of and in association with a gang with intent to promote further and assist the gang's criminal activities, within the meaning of Penal Code § 186.22(b)(1), and personally inflicted great bodily injury, within the meaning of Penal Code § 12022.7(a).

(*Id.* at 0003-04.)  In addition, the complaint alleged Grey had suffered a prior conviction, for which he had served a prison sentence, within the meaning of Penal Code §§ 667.5(b) and 668, and had suffered a prior "strike" conviction, within the meaning of Penal Code §§ 667(b)-(i), 1170.12, and 668, California's Three Strikes Law.  (*Id.* at 0005.)  Following a jury trial, Grey was convicted on all counts and the jury found all the allegations to be true.  (Lodgment No. 8, Vol. 3 at 0665-70.)

Grey appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment No. 4.)  The state appellate court affirmed Grey's conviction in a written, unpublished opinion.  (Pet., ECF No. 1-3.)  Grey then filed a petition for review in the California Supreme Court, which summarily denied the petition.  (Pet., ECF No. 1-4; Lodgment No. 1.)  Grey then filed a habeas corpus petition in the California Supreme Court.  (Lodgment No. 2.)  The California Supreme Court summarily denied the petition.  (Lodgment No. 3.)

Grey filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on November 9, 2016 [ECF No. 1].  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of Answer to Petition for Writ of Habeas Corpus on March 15, 2017 [ECF Nos. 14-15].  Grey filed a Traverse on June 19, 2017 [ECF No. 20].

## IV.  **DISCUSSION**

Grey raises four grounds in his Petition.  In ground one, he contends the trial judge denied him fair trial when he improperly excused a juror.  (Pet., ECF No. 1-2 at 1-5.)  In ground two, he contends trial counsel was ineffective for failing to present exculpatory alibi evidence to support a defense of mistaken identification.  (*Id.* at 6-19.)  In ground three, Grey alleges trial counsel was ineffective for failing to object to the removal of the juror.  (*Id.* at 19-23.)  And, in ground four, Grey argues his due process and fair trial rights were violated when the trial judge refused to instruct the jury to view the eyewitness identification with caution.  (*Id.* at 23.)

A.   *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id*.  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the

basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

Grey's claims center around his defense of mistaken identity. In claim one he contends the trial judge improperly removed Juror No. 8 when, following the testimony of the eyewitness defense expert, the juror realized he had participated in some of the studies the witness had performed while at the University of Texas. (Pet., ECF No. 1-2 at 1-5.) In claim two, Grey claims trial counsel was also ineffective when he failed to investigate and present alibi evidence which would have bolstered the expert's testimony and the mistaken identity defense. (*Id.* at 6-19.) In claim three, Grey alleges trial counsel was ineffective when he failed to object to Juror No. 8's removal. (*Id.* at 19-23.) Grey alleges in claim four that the trial judge wrongly refused to instruct the jury to view the eyewitness identification with caution. (*Id.* at 23.)

Respondent argues Grey's claim the trial judge improperly excused a juror is procedurally defaulted even though the appellate court reached the merits of the claim, and, in the alternative, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (P. & A. Supp.

16cv2764 GPC (AGS)

Answer, ECF No. 14-1 at 10-18.)   Respondent also argues Grey's claims that counsel was ineffective for failing to present alibi evidence and to object to the removal of the juror were reasonable rejected by the state court.  (*Id.* at 18-22.)  As to Grey's claim the trial court improperly refused to instruct the jury to view the eyewitness testimony with caution, Respondent contends the claim is unexhausted, and, in any event, meritless.  (*Id.* at 22-27.)

### 1. Removal of Juror No. 8 (ground one)

In ground one, Grey alleges the trial judge improperly removed Juror No. 8 during the trial when that juror told the judge he had attended the same university at which the expert taught and had participated in some of the studies on eyewitness testimony the expert cited.  (Pet, ECF No. 1-2 at 1-5; Traverse, ECF No. 20-1 at 11-20.)  Specifically, Grey contends the state court's denial of this claim was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) because Juror No. 8's statements did not establish he was biased, only that he harbored serious doubt about the reliability of eyewitness testimony, and that his removal therefore violated Grey's due process and fair trial rights.  (Traverse, ECF No. 20-1 at 19.)

Respondent claims this ground is procedurally defaulted because the last reasoned state court decision, the California Court of Appeal's opinion, concluded Grey had failed to object to the discharge of the juror and had therefore forfeited the claim.  (P. & A. Supp. Answer, ECF No. 14-1 at 14.)  In any event, Respondent argues, the claim is meritless.  (*Id.* at 14-18.)  In his Traverse, Grey contends the claim is not procedurally defaulted because the state court decided the merits of his claim.  In addition, Grey claims he has established cause for the default and prejudice because trial counsel was ineffective for failing to object to the juror's removal.  (Traverse, ECF No. 20-1 at 15-16.)

### a. Procedural Default

Because the California Supreme Court summarily denied Grey's petition for review in which he raised his claim regarding Juror No. 8, this Court must "look through"

7

to the state appellate court's decision. *Ylst*, 501 U.S. at 805-06. That court concluded the claim had been waived under *People v. Holt*, 15 Cal. 4th 619, 656 (1997) because defense counsel did not object to the juror's removal. (ECF No. 1-3 at 9-10.) The appellate court went on to address the merits of the claim and denied Grey relief. (*Id*. at 10-11.)

The Ninth Circuit has held that because procedural default is an affirmative defense, in order to establish a claim is procedurally defaulted, Respondent must first "adequately [plead] the existence of an independent and adequate state procedural ground . . . ." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). In order to place the defense at issue, Grey must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id*. The "ultimate burden" of proving procedural default, however, belongs to the state. *Id*. If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Grey can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A state procedural rule is "independent" if the state law basis for the decision is not interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *Harris v. Reed*, 489 U.S. 255, 265 (1989). A ground is "interwoven" with federal law if the state has made application of the procedural bar depend on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009).) All cases cited by a state court must be independent and adequate to bar federal review of the claims. *Washington v. Cambra*, 208 F.3d 832, 834 (9th Cir. 2000).

Grey argues the claim is not procedurally defaulted because in addition to imposing a procedural bar, the appellate court addressed the merits of Grey's claim.

(Traverse, ECF No. 20-1 at 15.)  As Respondent notes, however, a procedural default is not nullified by a state court's decision on the merits of a claim as an alternative holding. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989).

Respondent has pled the existence of an independent and adequate state procedural bar.  Grey has not "asserted specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Bennett*, 322 F.3d at 586.  His claims are therefore procedurally defaulted unless he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

The cause prong is satisfied if Grey can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991). In his Traverse, Grey argues trial counsel's ineffectiveness by failing to object to Juror No. 8's dismissal caused the default.  (Traverse, ECF 20-1 at 15-16.)  As discussed below, however, in section IV(B)(2)(b) of this Report and Recommendation ("R&R"), the Court concludes counsel was not ineffective; accordingly, this cannot form the basis for a successful showing of cause under *Coleman*.  Grey does not allege any other "objective factor" that precluded him from raising this claim, and thus he has not established cause for the default. *McClesky*, 499 U.S. at 493-94.

"Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). Grey has not established prejudice resulting from the state court's imposition of the procedural bar because the court addressed the merits of the claim and denied it.  (Pet., ECF No. 1-3 at 10-11.)

Finally, Grey has also failed to demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750.  The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one who is actually

innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In *Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997), the Ninth Circuit held that "actual innocence" means factual innocence, not simply legal insufficiency; a mere showing of reasonable doubt is not enough.[2] Grey has not presented evidence sufficient to establish he is actually innocent of the charges of which he was convicted. Thus, Grey has not satisfied the fundamental miscarriage of justice exception, and his claim regarding the removal of Juror No. 8 is procedurally defaulted. *Schlup*, 513 U.S. at 327.

b. <u>Merits</u>

Even if Grey's claim regarding the removal of Juror No. 8 was not procedurally defaulted, it is meritless. During the defense portion of the case, Dr. Roy Malpass testified as an expert in eyewitness identification. Dr. Malpass had conducted several experiments regarding the accuracy of eyewitness identification and lineups while he worked at the University of Texas at El Paso. (ECF No. 1-3 at 4.) He testified generally about the unreliability of eyewitness testimony and specifically about the unreliability of the identification and biased lineup procedures in Grey's case. (*Id.* at 4-5.) During a break in the trial, Juror No. 8 asked to speak with the Judge. The following exchange took place in chambers:

THE COURT: "We're in my office with the two attorneys, the reporter and [the Juror]. Yes, sir. Go ahead. Tell us what your concerns are.

JUROR NO. 8: The last witness stated that he was a professor at the University of Texas at El Paso, and I believe I am now a biased juror because of that, because I actually attended the University of Texas at El Paso as a student, and I was a participant in some of the psychological studies that were discussed.

THE COURT: Do you recognize him?

_____

[2] *But see Vosgien v. Persson*, 742 F.3d 1131, 1135-36 (9th Cir. 2014) (stating a petitioner can show "actual innocence" by establishing that, based on subsequent case law, he is not legally guilty of the crimes of which he was convicted).

JUROR NO. 8: I do not recognize him. I do not recognize his name, but my fear is that the atmosphere of the researchers that he was a part of influenced me in the past, and it has helped me form an opinion, you know, that is biased in the favor of the defense.

THE COURT: Okay. Let's see. Mr. Rumble, do you have any questions you would like to ask the Juror?

MR. RUMBLE: So what do you mean by biased?

JUROR NO. 8: I feel like I have already formed an opinion of the – once the prosecutor rested, I felt I already formed a good solid opinion, and unless something else changed, then I almost knew which was I was going to cast my ballot for. But now that this witness has come up, I kind of feel guilty. I feel that I would feel guilty voting in that particular way. I'm not sure if it's appropriate to discuss how I would find the case.

THE COURT: No. I think we probably can infer it from what you said. I don't know that we need to go into that.

Let me ask you this: When were you there and participating in those studies?

JUROR NO. 8: Well, there was two periods when I was a student at the University of El Paso. I was a student between 1999 and 2000, also from 2006 to 2009, and it was during 1999 and 2000 when I participated in a psychological – psychology class, introduction to psychology. And part of the curriculum of that class was essays. And in lieu of writing an essay, you can participate in psychological studies, and I participated in a number of those, including studies that involved eyewitness identification.

THE COURT: Okay. You will only – bias means that you can't be fair anymore. It doesn't mean you have a difference in evidence, and you have to resolve that. Do you think that you are so biased, really, against the prosecutor now?

JUROR NO. 8: I believe so. I would feel very bad if I was forced to render a verdict. I'd constantly be questioning myself whether or not I made the right decision.

THE COURT: Mr. Rumble, any other questions?

MR. RUMBLE: No thanks.

THE COURT: Mr. Prosecutor, any questions?

MR. OJEIL: No.

THE COURT: Thank you for your candor. But you don't recognize the professor?

JUROR NO. 8: I do not recognize the professor.

THE COURT: Did you go through the types of studies he describes where something happens?

JUROR NO. 8: Yes. And followed up after on it. Afterwards, followed up on the studies. And, like, in the years I followed it, I heard stuff, you know, say, like, reports that had – that were related to those studies, and it would pique my curiosity because of my involvement in them. I would read up on the reports. I would read their findings that eyewitnesses were very unreliable, according to those studies, and so that influenced my development while I was – from the late teenage years through my 20's to form that opinion.

THE COURT: Thanks.

(Lodgment No. 7, Vol. 6 at 877-80.)

At the conclusion of this colloquy, the prosecutor told the judge the juror should be replaced and the defense attorney did not object. (*Id.* at 880-81.) The judge excused Juror No. 8. (*Id*. at 881.)

Grey argues the trial judge did not perform a sufficient inquiry into whether Juror No. 8 was actually biased and did not provide specific grounds for concluding Juror No. 8 was biased. (Pet., ECF No.1-2 at 4-5) In his Traverse, Grey also argues the California Court of Appeal's decision was based on an unreasonable determination of the facts. (Traverse, ECF No. 20-1 at 18-20.) The appellate court addressed this claim as follows:

First, we find the trial court did not abuse its discretion in how it conducted its inquiry. After hearing the Juror's concerns, the trial court

16cv2764 GPC (AGS)

questioned the Juror and invited counsel to question the Juror. The court ended its inquiry after it and counsel had no further questions. With the benefit of hindsight, we might fault the court for failing to ask additional questions. But we cannot say that the trial court abused its discretion in how it conducted its inquiry. Additionally, as we shall discuss, the record shows the trial court properly excused the Juror based on bias against the prosecution.

"[A]cutal bias" is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); Pen. Code § 1046 ["Trial juries for criminal actions are formed in the same manner as trial juries in civil actions."]; *People v. Hillhouse*, *supra*, 27 Cal.4th at p. 488.) Here, the Juror expressed concern he was biased against the prosecution, explaining that while he did not know Dr. Malpass, he attended the university where Dr. Malpass taught, participated in some of the studies Dr. Malpass discussed, followed up on these studies for years by reading reports and had formed an opinion on eyewitness testimony in favor of the defense. The court told the Juror that bias did not mean resolving a difference in the evidence, but rather that he could no longer be fair. It then asked the Juror if he was biased against the prosecution. The juror expressed his belief that he could not be fair and that he would "feel very bad" if forced to render a verdict.

The record shows the Juror's state of mind regarding eyewitness testimony made him biased against the prosecution and showed to a demonstrable reality the Juror could not be impartial. Accordingly, the trial court did not err by discharging the Juror. While Grey complains the trial court should have allowed the Juror to hear the remainder of Dr. Malpass's testimony before discharging the Juror, we fail to see how any additional testimony by Dr. Malpass would have changed the Juror's opinion based on the Juror's statement he had formed his opinion before Dr. Malpass testified and later felt guilty for doing so in light of Dr. Malpass's testimony.

(Pet., ECF No. 1-3 at 10-11.)

The Sixth Amendment to the United States Constitution guarantees "the right to a fair trial by a panel of impartial, 'indifferent' jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961). A fair trial requires that a jury reach a verdict based only on the evidence presented at trial. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). In California, the

13

mechanism for protecting this right is California Penal Code § 1089, which authorizes a trial judge to replace a juror when that juror "dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor." Cal. Penal Code § 1089 (West 2003). The Ninth Circuit has found California Penal Code § 1089 complies with the Sixth Amendment's requirements. *Bell v. Uribe*, 748 F.3d 857, 869 (9th Cir. 2014). Accordingly, the question here is whether the application of California Penal Code § 1089 violated Grey's Sixth Amendment rights. *Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997). Grey contends the application of California Penal Code § 1089, and the subsequent removal of Juror No. 8, violated his Sixth Amendment rights because the trial judge's inquiry was insufficient and because the decision was based on an unreasonable determination of the facts. (Pet., ECF No. 1-2 at 5; Traverse, ECF No. 20-1 at 18-20.)

The Ninth Circuit has recognized that United States Supreme Court authority on the subject of juror bias is "sparse." *Williams v. Johnson*, 840 F.3d 1006, 1010 (9th Cir. 2016). "Although we know that biased jurors may be dismissed from deliberations without offending the Constitution, we don't know precisely what it means for a juror to be biased." *Id.* (citing *United States v. Wood*, 299 U.S. 123, 146 (1936)). The Supreme Court has stated, however, that an unbiased juror is one who "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irwin*, 366 U.S. at 723 (citing *Spies v. People of State of Illinois*, 123 U.S. 131 (1887); *Reynolds v. United States*, 98 U.S. 145 (1878); *Holt v. United States*, 218 U.S. 245 (1910).) In the context of voir dire, the Supreme Court has noted a juror can be removed for cause if the juror's beliefs or opinions "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (internal quotations and citations omitted); *see also United States v. Padilla-Mendoza*, 157 F.3d 730, 733 (9th Cir. 1998). "[T]he determination [of bias] is essentially one of credibility, and therefore largely one of

/ / /

demeanor," and a trial court's determination about juror bias is entitled to "special deference." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citations omitted).

The appellate court noted the trial court could have asked more questions of Juror No. 8, but ultimately concluded the court has not abused its discretion. The judge questioned Juror No. 8 about the reasons he thought he should be excused. Juror No. 8 explicitly told the judge he was biased in favor of the defense on the subject of the reliability of eyewitness testimony because he had participated in some of the studies cited by Dr. Malpass. (Lodgment No. 7, Vol. 6 at 877-78.) He also stated he had formed a solid opinion at the close of the prosecution's case, but that Dr. Malpass's testimony made him feel "guilty" about his opinion due to his knowledge of the unreliability of eyewitness testimony and his participation in some of the studies cited by Dr. Malpass. (*Id.* at 878-79.) Given Juror No. 8's statements about his strongly held opinions regarding eyewitness testimony and Dr. Malpass's testimony, as well as Juror No. 8's own belief that he was biased, the appellate court's conclusion that the inquiry into Juror No. 8's bias was sufficient was not unreasonable.

Moreover, given the "special deference" afforded a trial judge's evaluation of a juror's credibility and demeanor, *Yount*, 467 U.S. at 1038, it was not an unreasonable determination of the facts for the state court to conclude Juror No. 8 was biased. Juror No. 8 specifically said his experience with and participation in the studies Malpass referred to in his testimony had "helped [him] form an opinion . . . that [was] biased in favor of the defense." (Lodgment No. 7, Vol. 6 at 878.) Juror No. 8 also stated that at the close of the prosecution's case he had formed an opinion, but that once Dr. Malpass began testifying he felt guilty about that decision because of his prior knowledge of and participation in studies about the reliability of eyewitness testimony. (*Id.* at 878-79.) He also felt if he continued to participate in the trial he would "be constantly questioning [himself] whether or not [he] made the right decision." (*Id.* at 879.) These facts support a conclusion by the state court that Juror No. 8 could not "lay aside his impression or opinion and render a verdict based on the evidence presented in court," and that his

beliefs or opinions "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Irwin*, 366 U.S. at 723; *Wainwright*, 469 U.S. at 433.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Grey is not entitled to relief as to this claim.

## 2.  Ineffective Assistance of Counsel (grounds two and three)

In grounds two and three, Grey contends trial counsel was ineffective in two ways. First, he claims counsel did not present available alibi evidence which would have supported Grey's mistaken identity defense.  (Pet., ECF No. 1-2 at 6-19; Traverse, ECF No. 20-1 at 20-23.)  Second, Grey argues trial counsel should have objected to the removal of Juror no. 8.  (Pet., ECF No. 1-2 at 19-23; Traverse, ECF No. 20-1 at 23-24.)

Grey raised his ineffective assistance of counsel claims in a petition for writ of habeas corpus he filed in the California Supreme Court.  (Lodgment No. 2.)  The California Supreme Court summarily denied the petition, and therefore this Court must conduct an independent review of the record to determine whether the denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  He must also show he was prejudiced by counsel's errors.  *Id.* at 694.  Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also Fretwell v. Lockhart*,

506 U.S. 364, 372 (1993). Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

      a. <u>Failure to Call Alibi Witnesses</u>

Grey argues counsel should have called three witnesses which he claims would have established he was at his mother's home caring for his daughter at the time of the shooting. (Pet., ECF No. 1-2 at 13-19; Traverse, ECF No. 20-1 at 21-23.) According to Grey, these witnesses, in conjunction with Malpass's testimony regarding the unreliability of eyewitness testimony, would have bolstered his contention at trial that he was the victim of mistaken identification. (Pet., ECF No. 1-2 at 13-19; Traverse, ECF No. 20-1 at 21-23.) Grey attached declarations from the three witnesses to the petition for writ of habeas corpus he filed in the California Supreme Court as Exhibits E, F and G as support for his claim. (*See* Pet'rs Lodgment No. 1, ECF No. 2-1 at 81-83.)

Exhibit E is a declaration from Coquise Flournoy, Grey's sister. In her declaration, Coquise states she was at her mother's house on January 21, 2012, the day of the murder. (*Id.* at 82-84.) That morning, she, her sister Chikia, and friend Justice Williams went to the hospital to visit Julian Velasquez, who had been shot the previous day. (*Id.*) On the way home from the hospital, she bought lunch to bring home to Grey and others who were at her mother's house. (*Id.* at 82.) Coquise states Grey's daughter Jordyn was at her mother's home, that Grey was watching her, and that Grey would not have left the house without Jordyn and would not have taken her to a dangerous place like a shooting. (*Id.*) Coquise believes that Grey could not have been involved in the shooting because she did not notice anything different about him that day. (*Id.* at 83-84)

Exhibit F is a declaration from Chikia Flournoy, another of Grey's sisters. (*Id.* at 85-88.) Chikia states she, Coquise and others went to the hospital the morning of January

21, 2012, then returned to her mother's home after buying lunch for herself, Coquise and others who were at the home. (*Id.* at 86.) Chikia left her mother's home around 1:00 p.m., and Grey stayed behind with his daughter Jordyn. (*Id.*.) She saw Grey at about 2:00 p.m. outside the gates of his mother's apartment complex, and the next time she saw Grey was in the evening of that same day at her mother's home. (*Id.* at 87-88.) She did, however, speak to Grey several times during the day. (*Id.*)

Exhibit G is a declaration from Justice Williams, a friend of Coquise and Chikia. Williams also knows Grey. (*Id.* at 89-93.) After attending a memorial service for Hopeton Bennett, Williams spent the night at the Flournoy's home on Friday, January 20, 2012. (*Id.* at 90.) The next morning, January 21, Williams, Coquise, Chikia and others went to the hospital to visit Velasquez. They returned to the Flournoy home around noon with lunch. (*Id.* 91-93.)

None of the declarations Grey has provided conclusively establish where he was at 4:00 p.m. on January 21, 2012, the day and time of the shooting, and thus they do not establish an alibi for Grey.[3] Moreover, the theory of the prosecution's case was that Grey was retaliating for the murder of Hopeton Bennett and the shooting of Julian Velsaquez the day before. According to the gang expert who testified at trial, Bennett, Velasquez and Grey were all members of the Parkside/Skyline gang. (Lodgment No. 7, Vol. 5 at 691-92.) Gang members are expected to retaliate for shootings committed against their members by rival gangs by shooting members of that rival gang. (*Id.* at 679.) Lincoln Park gang is a rival to Parkside/Skyline gang and the murder victim from the January 21 shooting, Edwin Jackson, was a Lincoln Park gang member. (*Id.* at 676, 717-18.) All three witness declarations state they were friends with Julian Velasquez and were trying to visit him in the hospital on January 2, 2012; Williams also says she attended a

---

[3] The declarations do, however, establish a potential alibi for DeAndre Grey, Antuon's brother, who was originally charged and prosecuted along with Antuon for Jackson's murder and other crimes relating to the shooting. The prosecution dismissed the case against DeAndre mid-trial, however, when no witness could identify him. (Lodgment No. 2, Vol. 3 at 320-21.)

16cv2764 GPC (AGS)

memorial service for Bennett the night before the shooting of which Grey is accused. (See Lodgment No. 2, Exs. E, F, G.) Based on these facts, trial counsel reasonably concluded none of the proposed witnesses would have been helpful to the defense and may have even been detrimental. *Strickland*, 466 U.S. at 688. The witnesses could not provide a strong alibi for Grey. Moreover, on cross examination the prosecutor would have exposed their connections to Bennett and Velasquez and their motivation for testifying in Grey's favor. For the same reasons, Grey has not established he was prejudiced by counsel's failure to present the witness's testimony. *Strickland*, 466 U.S. at 694. There is no reasonable probability the result of Grey's trial would have been different had the witnesses testified. Their testimony was not exculpatory and the jury would not have given their testimony much weight given the biases which would have exposed on cross examination. *Id.*

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Grey is not entitled to relief as to this claim.

       b. <u>Failure to Object to the Removal of Juror No. 8</u>

Grey also claims counsel should have objected to the dismissal of Juror No. 8. (Pet., ECF No. 1-2 at 19-23; Traverse, ECF No. 20-1 at 20-21.) As discussed in section IV(B)(1)(b) of the Report and Recommendation and the California Court of Appeal's opinion, however, the dismissal was proper under California law. Juror No. 8 explained he was biased against the prosecution because he had participated in some of the studies cited by Malpass and had formed a solid opinion at the close of the prosecution's case. Given his knowledge of and experience with studies regarding the reliability of eyewitness testimony, he would "feel guilty voting in that particular way" and would "constantly be questioning myself whether or not I made the right decision. (Lodgment No. 7, Vol. 6 at 877-79.) It was reasonable for counsel to conclude that any objection to the removal of Juror No. 8 would have been unsuccessful. *Strickland*, 466 U.S. at 688.

Even if counsel's performance was deficient when he failed to object to the removal of Juror No. 8, Grey has not established he was prejudiced by counsel's failure to do so because there is not a reasonable likelihood the trial judge would have altered his ruling. *Strickland*, 466 U.S. at 697. Following the questioning of Juror No. 8, the trial judge stated, "I think in view of what he's saying, that I should excuse him. Do I do that with your – over your objection?" (Lodgment No. 7, Vol. 6 at 881.) Counsel responded that he would submit on the issue. (*Id.*) Thus, the trial judge clearly indicated he would excuse Juror No. 8 even if counsel had objected.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Grey is not entitled to relief as to this claim.

### 3. Refusal to Give Jury Instruction on Eyewitness Identification (ground four)

Grey's last claim relates to the trial court's refusal to give an instruction on eyewitness testimony. (Pet., ECF No. 1-2 at 23; Traverse, ECF No. 20-1 at 24-26.) Specifically, Grey asked the trial judge to give a modified version of CALCRIM No. 315 which told the jury they should view testimony about eyewitness identification with caution. (Pet., ECF No. 1-2 at 23; Traverse, ECF No. 20-1 at 25-26.) Respondent contends the claim is unexhausted because Grey did not alert the state court to the federal constitutional basis for his claim. (Answer, ECF No. 14-1 at 23.) Respondent also argues the claim fails on the merits. (*Id.* at 24-27.)

As Respondent correctly notes, Grey did not allege the failure to give a modified jury instruction violated his federal due process rights in state court. In both the state appellate court and the state supreme court, Grey asked the court to "join the majority of federal courts and several other state courts in now requiring criminal juries to be instructed to view eyewitness identification evidence with caution." (Appellant's Opening Brief, ECF No. 15-4 at 40-53; Pet. for Review, ECF No. 1-4 at 25.) The brief and the petition cite several federal appellate court cases, but nowhere in his state court

filings does Grey explicitly state that the failure to give the requested instruction violated his federal constitutional rights. (*See* Appellant's Opening Brief, ECF No. 15-4 at 43-44, 46, 49-50; Pet. for Review, ECF No. 1-4 at 27, 28-29.) "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014) (quoting *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996), internal quotation marks omitted.)

The claim is, however, technically exhausted. "[I]f a claim is unexhausted but [independent and adequate] state procedural rules would now bar consideration of the claim, it is technically exhausted but will be deemed procedurally defaulted unless the petitioner can show cause and prejudice." *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011); *Coleman v. Thompson*, 501 U.S. 722, 735, n. (1991). The procedural bar of *In re Dixon*, 41 Cal. 756, 759 (1953) (a defendant cannot raise a claim in a habeas corpus petition that he could have, but did not, raise on appeal), and California's timeliness rule, as explained in *In re Robbins*, 18 Cal. 4th 770, 780 (1998), have both been deemed independent and adequate state procedural bars. *Johnson v. Lee*, __ U.S. __, 136 S. Ct. 1802, 1805 (2016) (per curiam); *Walker v. Martin*, 562 U.S. 307, 317 (2011). Grey must establish cause and prejudice or that a fundamental miscarriage of justice has occurred in order to overcome the default. *Coleman*, 501 U.S. at 750.

As discussed above, cause for the purposes of procedural default is some "objective factor" that precluded Grey from raising this claim in state court, such as interference by state officials or constitutionally ineffective counsel. *McClesky*, 499 U.S. at 493-94. Grey does not allege any objective factor that precluded him from raising the federal aspect of his jury instruction claim in state court, and thus he has not established cause for the default. *Id.* Prejudice means "actual harm resulting from the alleged error." *Vickers*, 144 F.3d at 617. Grey has not shown he was prejudiced by imposition of the procedural bar because the claim fails on the merits, as discussed below. Nor has Grey established a fundamental miscarriage of justice would occur if the claim is not

16cv2764 GPC (AGS)

addressed. *See Coleman*, 501 U.S. at 750. The "miscarriage of justice" exception requires a petitioner to show that "a constitutional violation has probably resulted in one who is actually [and factually] innocent." *Schlup*, 513 U.S. at 327; *Wood*, 130 F.3d at 379 ("actual innocence" means factual innocence, not simply legal insufficiency). Grey has not presented evidence sufficient to establish he is actually innocent of the charges of which he was convicted. Thus, this claim procedurally defaulted. *Schlup*, 513 U.S. at 327.

In any event, the claim fails on the merits. Instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instruction cannot be judged in isolation, however. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Rather, it must be considered in the context of the entire trial record and the instructions as a whole. *Id.*

The trial court gave the jury a modified version of CALCRIM No. 315 which addresses eyewitness testimony. It instructed the jury as follows:

> You have heard eyewitness testimony identifying the defendant. Each of you alone must evaluate the credibility of the witnesses. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. Consider the possibility that a witness made an honest but mistaken identification.

> In evaluating identification testimony, consider all of the evidence, including but not limited to the following questions:

> - Did the eyewitness know or have contact with the defendant before the event?
> - How well could the witness see the perpetrator?
> - What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance between the witness and the perpetrator at the time of the observation and duration of observation?

- How closely was the witness paying attention?
- Was the witness under stress when he or she made the observation?
- Did the witness give a description and how does that description compare to the defendant?
- How much time passed between the event and the time when the witness identified the defendant?
- Was the witness ever asked to pick the perpetrator out of a group?
- Did the witness ever fail to identify the defendant?
- Did the witness ever change his or her mind about the identification?
- Are the witness and the defendant of different races?
- Was the witness able to accurately identify other participants in the crime?
- Was the witness able to identify the defendant in a photographic or physical lineup?
- What was the construction and presentation of the lineup shown to the witness?
- Were there any other circumstances affecting the witness's ability to make an accurate identification?

The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty.

(Lodgment No. 8, Vol. 2 at 379-80.)

Trial counsel asked the judge to add the following phrase to the instruction: "You must view eyewitness testimony with caution and evaluate it carefully." (Lodgment No. 7, Vol. 7 at 990.) The trial judge declined to do so because he believed the instruction to be "argumentative" and because he believed CALCRIM No. 301 addressed trial counsel's concern. (*Id.* at 990-94.)

Considering the instructions as a whole, as the Court is required to do under *Estelle*, the failure to give the modified instruction did not "so infect[] the entire trial that the resulting conviction violates due process." *Murtishaw*, 255 F.3d at 971; *Henderson*, 431 U.S. at 154. The thrust of the defense was that eyewitness identification in general

1    was not reliable and that Grey was the victim of a mistaken identification and a biased

2    lineup.  The defense expert, Dr. Malpass, testified the reliability of eyewitness testimony

3    was affected by: (1) the specificity of a witness's description of the suspect, (2) whether

4    the suspect was wearing clothing, such as a hooded jacket, that obscured his face; (3)

5    how a lineup was constructed and administered, (4) whether the witness was under stress

6    when he or she observed the suspect, (5) how far away the witness was from the suspect;

7    (6) the length of time the witness was able to observe the suspect, (7) the length of time

8    between the event and the witness's identification, and (8) whether the witness was

9    familiar with the suspect.  (Lodgment No. 7, Vol. 6 at 864-99.)  Applying these factors in

10   Grey's case, Dr. Malpass testified the witness's identification of Grey was unreliable

11   because his description was vague and inconsistent; the hooded jacket the suspect was

12   alleged to have been wearing partially obscured the suspect's features and made

13   identification more difficult; the lineup conducted in Grey's case was problematic

14   because it used five pictures instead of six; the photos in the lineup were not consistent,

15   and it was not administered properly; the witness was far away from the suspect when he

16   observed him; the witness was under stress at the time he observed the suspect because

17   the suspect was displaying a gun and shooting; two weeks had passed between the event

18   and the witness's identification of Grey; and the witness was unfamiliar with Grey and

19   was therefore more likely to make an incorrect identification.  (*Id.*)

20        All of the considerations cited by Dr. Malpass are explicitly covered by the version

21   of CALCRIM No. 315 given to the jury.  (Lodgment No. 8, Vol. 2 at 379-80.)  Moreover,

22   CALCRIM No. 315 told the jury they "alone must evaluate the credibility of the

23   [eyewitnesses]," and that they should "[c]onsider the possibility that a witness made an

24   honest but mistaken identification."  (Lodgment No. 8, Vol. 2 at 379.)  The jury was also

25   told they were to determine whether the eyewitness gave "truthful and accurate

26   testimony," and that the prosecution had the burden to prove beyond a reasonable doubt

27   that it was Grey who committed the crime.  (*Id.*)  In addition, CALCRIM No. 301

28   cautioned the jury that "[b]efore you conclude that the testimony of one witness proves a

fact, you should carefully review all the evidence." Given the totality of the instructions, the jury was properly informed regarding their duty to carefully consider the evidence, including the eyewitness evidence, and hold the prosecution to its burden of proof. There was no federal constitutional error, and Grey is therefore not entitled to relief as to this claim. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003) (where there is no state court decision on a claim to which the federal court can defer, the Court must conduct a de novo review of the claim).

### 4. Evidentiary Hearing

Grey asks for an evidentiary hearing in his case. (Traverse, ECF No. 20-1 at 9.) Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

/ / /

In order to determine whether to grant an evidentiary hearing, the court must first "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078). If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70. A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

Pursuant to *Cullen v. Pinholster*, 563 U.S. 170 (2011), Grey is limited to the facts presented to the state court. In *Pinholster*, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court. *Pinholster*, 563 U.S. at 181-82. Petitioner can only proceed to develop additional evidence in federal court if either § 2254(d)(1) or (d)(2) is first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1076 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief" and citing *Pinholster*, 563 U.S. 131 S. Ct. at 203, n. 20). It has not been here for all the reasons discussed above. Accordingly, the Court recommends Grey's request for an evidentiary hearing be **DENIED**.

## V.    **CONCLUSION**

The Court submits this Report and Recommendation to United States District Judge Gonzalo P. Curiel under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation; (2) denying the request for an evidentiary hearing; and (3) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

16cv2764 GPC (AGS)

**IT IS ORDERED** that no later than October 5, 2018, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than October 19, 2018. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: September 20, 2018

_____
Magistrate Judge John L. Weinberg